IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>   vs.<br><br>$445,000.00 UNITED STATES CURRENCY,<br><br>                Defendant. | Civil No. 8:21CV342<br><br>**COMPLAINT FOR FORFEITURE *IN REM*** |

The United States of America, for its cause of action against the defendant property, pursuant to Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions, states and alleges as follows:

**Nature of the Action**

1. This is an action to forfeit property to the United States for violations of 18 U.S.C. § 981.

**The Defendant *in rem***

2. Defendant property consists of $445,000 United States currency seized from a rented white Kia Optima on April 11, 2021, during a traffic stop on westbound Interstate 80 in Seward County, Nebraska. Suljo Alic was the driver and Samson Mrsic was the passenger.

3. The U.S. Customs and Border Protection (CBP) currently has custody of the defendant property.

**Jurisdiction and Venue**

4. This Court has subject matter jurisdiction for an action commenced by the United States pursuant to 28 U.S.C. § 1345, and for an action for forfeiture pursuant to 28 U.S.C.

§ 1355(a). This Court also has jurisdiction over this particular action pursuant to 21 U.S.C. § 981.

5. This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

## Basis for the Forfeiture

7. Defendant property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense," is subject to civil forfeiture to the United States. Per 18 U.S.C. § 1956(c)(7)(A), specified unlawful activities include offenses listed in 18 U.S.C. § 1961(1). Per 18 U.S.C. § 1961(1), interstate transportation of stolen goods, in violation of 18 U.S.C. §§ 2314 and/or 2315, is a specified unlawful activity, the proceeds of which are subject to forfeiture per 18 U.S.C. § 981(a)(1)(C).

## Facts

8. On April 11, 2021, York County Sheriff's Office Deputy Korey Goplin (hereinafter "Dep. Goplin") was on patrol in Seward County as part of the Homeland Security Investigations-sponsored Criminal Interdiction Taskforce.

9. While on patrol on Interstate 80 at approximately 1:30 p.m., Dep. Goplin observed a white Kia Optima (hereinafter "Kia") traveling in excess of the 75 MPH limit, in violation of Nebraska traffic laws.

10. Dep. Goplin entered into Interstate 80 to catch up to the Kia.

11. While Dep. Goplin attempted to catch up to the Kia, he observed the Kia pass multiple vehicles at a high rate of speed.

12. Dep. Goplin further observed the Kia fail to use its signal when it switched lanes, in violation of Nebraska traffic laws.

13. Dep. Goplin caught up to the Kia near mile marker 377 on Interstate 80 and initiated a traffic stop.

14. Dep. Goplin made contact with the driver, Suljo Alic (hereinafter "Alic").

15. The Kia also contained a passenger, Samson Mrsic (hereinafter "Mrsic").

16. Dep. Goplin observed multiple energy drinks scattered throughout the Kia.

17. Dep. Goplin noted the odor of cigarettes from the Kia.

18. Dep. Goplin asked Alic if he knew why Dep. Goplin had initiated the traffic stop.

19. Alic acknowledged that he did know why the officer pulled him over and it was because he was speeding.

20. Alic further explained to Dep. Goplin that he was speeding because he was attempting to drive around a motorcycle that had been in the passing lane.

21. Dep. Goplin informed Alic that he also initiated the traffic stop because Alic failed to signal his lane change while driving the Kia around a truck and camper.

22. Alic apologized for the violations.

23. Dep. Goplin asked Alic to accompany Dep. Goplin back to his patrol vehicle. Alic agreed.

24. Alic provided Dep. Goplin with his license which indicated he was from Meridian, Idaho.

25. Mrsic provided Dep. Goplin with the rental agreement for the Kia.

26. Dep. Goplin noted that the Kia was a one-way rental from St. Louis, Missouri to Portland, Oregon.

27. Alic informed Dep. Goplin that he was traveling with Mrsic, his brother-in-law, and had rented a different car to drive from Boise, Idaho to St. Louis, Missouri.

28. Dep. Goplin later learned that Alic and Mrsic had not rented a car from Boise but rather a Penske box truck.

29. Based on his training and experience in law enforcement, Dep. Goplin noted that renting a one-way vehicle to a location, and then renting another one-way vehicle back from that location was unusual.

30. Alic further informed Dep. Goplin that he and Mrsic had stayed a couple nights in Des Moines, Iowa with Alic's girlfriend during this trip.

31. When Dep. Goplin asked Alic how someone from Boise, Idaho meets a girl in Des Moines, Iowa, Alic responded, "family connections, you know."

32. Based on his training and experience, Dep. Goplin believed this response to be vague and the circumstances to be unusual. In particular, that Alic would bring his brother-in-law on a cross-country trip to visit Alic's girlfriend.

33. Alic further stated that he and Mrsic drove out to St. Louis to visit his uncle.

34. Based on his training and experience, Dep. Goplin again noted that bringing a brother-in-law on a cross-country trip to St. Louis to visit an uncle is unusual.

35. Alic informed Dep. Goplin that he and Mrsic had only stayed in St. Louis for 2-days as it was a quick turnaround trip to St. Louis and back home.

36. Based on his training and experience, Dep. Goplin knew that often times those involved in criminal activity will make quick turnaround trips while conducting criminal activity in order to get contraband from point A to point B as quickly as possible.

37. Based on the information Alic provided, in conjunction with his training and experience, Dep. Goplin believed Alic and Mrsic's travel itinerary appeared illogical in that they would drive 30 hours for a 48-hour stay.

38. Dep. Goplin noted that Alic's travel story began to change.

39. Alic informed Dep. Goplin that Mrsic had just "came by" and asked Alic if he wanted to go to St. Louis with him and Alic agreed.

40. Dep. Goplin noted that this new story differed from Alic's previous statements in that the reason for the trip had changed.

41. Dep. Goplin also noted that based on Alic's new version of the story, it was Mrsic that had initiated the trip, not Alic.

42. Dep. Goplin asked Alic who Mrsic knew in St. Louis and what his purpose was for travel.

43. Dep. Goplin observed that Alic had difficulty in relaying a response to these questions.

44. Alic stated, "We pretty much have the same family. We are all family friends."

45. Dep. Goplin had previously ran Alic's information through dispatch and dispatch advised Dep. Goplin that Alic had a prior charge for felony possession of narcotics.

46. Alic informed Dep. Goplin that he was on probation for possession of heroin.

47. Dep. Goplin asked Alic if he had any heroin in the Kia.

48. Alic responded, "No."

49. Dep. Goplin asked Alic if he had a large amount of U.S. currency in the Kia.

50. Alic did not verbally respond.

51. After Dep. Goplin asked Alic this question, Alic looked directly back at the Kia in which he was traveling.

52. Dep. Goplin noted Alic's response as a change of behavior.

53. Based on his training and experience, Dep. Goplin knew that those involved in criminal activity will often times have a change in behavior when asked about emotionally relevant topics.

54. Dep. Goplin noted that based on his observations, the phrase "large amounts of currency" was emotionally relevant to Alic that triggered a different response from Alic.

55. Dep. Goplin conducted a VIN number check on the Kia.

56. During his check, Dep. Goplin made contact with Mrsic.

57. Mrsic rented the Kia.

58. Mrsic has an Oregon driver's license.

59. Mrsic told Dep. Goplin the reason for his and Alic's trip was to visit Mrsic's family.

60. Dep. Goplin noted this was contrary to Alic's version of the story whereby Alic indicated the purpose of the trip was to visit Alic's family.

61. Mrsic confirmed that he and Alic had only been in St. Louis, Missouri for a short period of time.

62. After Dep. Goplin checked the VIN number, he went back to his patrol vehicle and provided all of Alic's items back to him.

63. Additionally, Dep. Goplin provided Alic with a warning citation.

64. Dep. Goplin then asked Alic for consent to search the Kia.

65. Alic granted Dep. Goplin consent to search the Kia.

66. Immediately after granting Dep. Goplin consent to search, Dep. Goplin observed Alic unlock his iPhone and begin texting.

67. Dep. Goplin then approached the Kia and informed Mrsic that Alic had consented to a search of the Kia.

68. Dep. Goplin asked Mrsic if he would consent to a search of the Kia.

69. Mrsic initially granted consent but then asked if he could deny the request to search.

70. Dep. Goplin advised Mrsic that he could deny his request to search.

71. Mrsic then denied consent to search the Kia.

72. Dep. Goplin then asked Mrsic to roll up the window of the Kia as Dep. Goplin was going to conduct a K9 deployment around the Kia.

73. Dep. Goplin retrieved his certified police K9 and deployed him on the Kia.

74. Based on his training and experience, Dep. Goplin believed the following to be indicators of criminal activity:

    - The source and destination of the trip
    - One-way rental between St. Louis and Portland
    - Multiple energy drinks
    - Cigarette odor
    - Discrepancy in reason for travel
    - Quick turnaround trip
    - Vague answers
    - History of drug possession
    - Texting throughout the traffic stop
    - Drove two days non-stop to St. Louis
    - Change in behavior when asked about large amounts of U.S. currency

75. Dep. Goplin approached the Kia with his K9 and observed the K9 begin to alert on the trunk area of the Kia.

76. Dep. Goplin observed the K9 pull back towards the rear of the Kia as Dep. Goplin was working his way up the passenger side of the Kia.

77. Dep. Goplin observed the K9 alert on the seam of the Kia near the trunk.

78. Dep. Goplin observed the K9 indicate on the seam on the rear of the vehicle.

79. Dep. Goplin returned the K9 to his patrol vehicle.

80. Dep. Goplin then reapproached Mrsic and informed him that the K9 alerted and indicated on the Kia.

81. Dep. Goplin further advised Mrsic that he would therefore be conducting a search of the Kia.

82. As Mrsic exited the Kia, Dep. Goplin asked him if he had anything illegal in the Kia.

83. Mrsic denied having anything illegal in the Kia.

84. Dep. Goplin conducted a search of the Kia and located a catalytic converter.

85. Based on his training and experience, Dep. Goplin was aware that the theft of catalytic converters had recently become a large issue.

86. Dep. Goplin located a large suitcase inside the Kia.

87. Alic claimed this suitcase was his.

88. Inside Alic's suitcase, Dep. Goplin located $15,000 in U.S. currency.

89. This currency later tested positive on a D4D kit for containing marijuana residue.

90. Alic claimed this currency derived from gambling winnings.

91. Dep. Goplin located a Michael Kors designer duffel bag in the back seat of the Kia.

92. Inside the bag, Dep. Goplin observed multiple bundles of U.S. currency.

93. Dep. Goplin observed that three bundles of U.S. currency appeared to be directly from a financial institution.

94. Dep. Goplin further observed that a fourth bundle of U.S. currency did not appear to be directly from a financial institution.

95. In particular, Dep. Goplin noted that the fourth bundle had bank bands but the currency was not "faced".

96. Based on his training and experience, Dep. Goplin knew that financial institutions typically face their currency.

97. Mrsic stated that he had a receipt from a financial institution for the currency.

98. Mrsic provided the receipt for the currency in the amount of $430,000.

99. Dep. Goplin noted that Mrsic began to change his story regarding the trip.

100. In particular, Mrsic told Dep. Goplin that he flew from Portland to St. Louis but then backtracked and stated he had driven a Penske rental box truck.

101. Dep. Goplin located a receipt for the Penske rental truck. The receipt indicated Mrsic rented the truck in Portland on April 5, 2021, at 10:17 a.m. and returned it to St. Louis on April 7, 2021, at 2:50 p.m.

102. Mrsic then stated his purpose for travel from Portland to St. Louis was to sell used car parts in St. Louis.

103. Dep. Goplin asked Mrsic if he had any paperwork to substantiate any of those business transactions.

104. Mrsic denied having any paperwork for the business transactions.

105. Due to the changing facts of Mrsic and Alic's stories, Dep. Goplin contacted Sheriff Mike Vance (hereinafter "Sheriff Vance") to assist in the investigation.

106. After speaking further with both occupants, Mrsic stated that Alic was present with him when he unloaded the auto parts and sold them in St. Louis.

107. Alic however, stated that he was not present with Mrsic when he unloaded the Penske truck.

108. Alic further stated that he does not get involved in Mrsic's business transactions.

109. Alic confirmed he saw the contents of the Penske truck.

110. Alic disclaimed ownership to the currency in the Kia and stated that it was not his.

111. Mrsic claimed that the currency seized from the Kia is proceeds from his business.

112. Sheriff Vance asked Mrsic how much he claimed on his taxes last year and Mrsic stated he did not file taxes.

113. When asked about the prior year, Mrsic stated he made approximately $60,000 to $70,000.

114. During the traffic stop, law enforcement seized Mrsic's black iPhone 12 Pro.

115. During the traffic stop, law enforcement seized Alic's black iPhone XR.

116. On April 12, 2021, officers transported the seized currency to Jones Bank, where it was counted and converted into a cashier's check in the amount of $445,000.00.

117. The following day, the cashier's check was transferred to the custody of Homeland Security Investigations in Omaha.

118. On April 15, 2021, Dep. Goplin applied for and was granted a search warrant for Mrsic and Alic's cellular telephones.

119. Mrsic's iPhone contained numerous photographs of catalytic converters.

120. Similarly, Alic's iPhone also contained numerous photographs of catalytic converters.

## Claim for Relief

WHEREFORE the United States of America prays the defendant property be proceeded against for forfeiture in accordance with the laws, regulations and rules of this Court; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the defendant property be condemned, as forfeited, to the United States of America and disposed of according to law and regulations; that the costs of this action be assessed against the defendant property; and for such other and further relief as this Court may deem just and equitable.

                                                UNITED STATES OF AMERICA,
                                                Plaintiff

                                                JAN W. SHARP
                                                Acting United States Attorney

By:    s/ Mikala Purdy-Steenholdt
        MIKALA PURDY-STEENHOLDT
        (NY#5112289)
        Assistant U.S. Attorney
        1620 Dodge Street, Suite 1400
        Omaha, NE  68102-1506
        Tel:  (402) 661-3700
        Fax:  (402) 345-5724
        E-mail: Mikala.Purdy-Steenholdt@usdoj.gov

## VERIFICATION

I, Andrew Vincik, hereby verify and declare under penalty of perjury that I am a Special Agent with Homeland Security Investigations (HSI) that I have read the foregoing Verified Complaint *in rem* and know the contents thereof, and that the factual matters contained in paragraphs 8 through 120 of the Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with HSI.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: September 2nd, 2021

Andrew Vincik,
Special Agent
Homeland Security Investigations